Thank you, Your Honor. May it please the Court, I'm Philip Trevino, and with me is Michael Brennan as counsel to the Petitioner, Appellant Benjamin Silva. And we are here, as the Court is aware, on a single claim this time, and that is the Brady claim. It is our view that it's been very thoroughly presented in the briefing, and I know, of course, from this Court's previous review of this matter, it's got an intimate knowledge already of the details. I have no further presentation, but I would welcome an opportunity to answer any questions the Court may have. Roberts, what do you think of the district court in this case put a great deal of emphasis on the contradictory verdicts, if you will, the finding of responsibility in one instance and not another. How do you respond to that? Brennan I think it's an enigma. I wish that I knew what it really told us. I don't think we can know. Certainly with regard to Norman Thomas and what weight should be attached to his testimony, it is particularly puzzling that if the jury found this witness to be credible, that they could nevertheless return a guilty verdict on one of the counts while they return the not guilty on the other. On the other hand, the puzzle remains even if they found the witness to be uncredible. So I don't see how it helps us really in the Brady analysis, but I do admit it is a very unusual twist. In looking at the record, at one point the district court judge dismissed the count about torture as to Craig because didn't find evidence in the record to support it as against Silva. And one other thing, and I don't really know what the content of it was, the jury came in and asked for a read back on the testimony of the doctor in the Craig case. What was the content of that? Dr. Laquan's testimony, that is correct, Your Honor. And it had to do with what they found with regards to her remains that were recovered, if you recall, after there had been what was termed animal deprivation. In other words, that animals had eaten the corpse that was lying in a snow covered ravine. But if I'm May, Your Honor, I'd have to point out I don't have the recollection the court does. It's my recollection that what the trial judge dismissed was a count that charged sodomy against that particular individual. And the charge, the only evidence in the record that might have initially supported such a charge was based on Norman Thomas's testimony. But then as he later changed his testimony or changed the statements that he was giving and there was no proof whatsoever presented on that to the trial or during the trial, there was, in fact, a motion granting a dismissal of that. Perhaps that's what Your Honor had in mind. They could be. It's a pretty fat thing. I've read it all, but. Well, we've tried to keep busy. Well, the district court commented that the jury had to have really parsed the evidence out because they acquitted Silva of, I hope I don't get this back, of Thorpe's death, but not of Craig's, and that there was other, ample other physical evidence connecting or other corroboration connecting Silva to Craig's death. And I'm just wondering whether that can hold true. I mean, considering the prejudice analysis that we would look at, suppose if the jury had learned of the deal between Thomas's counsel and the state, would, I mean, can we say that that wouldn't have so overwhelmed every other fact that the so-called corroborating evidence wouldn't be corroborating anything because they would just disbelieve Thomas? If I'm following Your Honor, yes. I think the answer to your question is that it is correct. If this aspect of the plea agreement, namely that Norman Thomas was to forego psychiatric evaluation, had been put in front of the jury, none of what has by others, not by us as counsel to the Petitioner, been considered as corroborating evidence, none of that evidence would have had any weight. And the reason I say that we don't adopt that characterization, Your Honor, we certainly recognize and have no dispute with the fact that there is forensic evidence, A, that these horrific crimes occurred, B, that these three men, including our client, were at the scene where these crimes occurred, either before, during, or after the time,  were concerned with Kevin Thorpe, who was killed. That remains an open question. So all of what might cause, Your Honor, legitimate pause as forensic evidence will remain unchallenged. It will not be changed. Those events occurred. But the question still comes down to this. Can we rely on Norman Thomas' word for the premise that it was Petitioner who committed that homicide? Well, if we were to find that there had been a Brady violation that requires reversal of the conviction, is the government able to retry Silva? I don't know, Your Honor. I'm not in a position to be able to answer that question. Would they be able to go back in time and cure the failure to disclose the contents of the plea agreement? I can't address that either, Your Honor. Maybe the government can. I can only address the fact that the violation occurred. Whether they will be able to produce sufficient proof. They could have had this trial the first time if they had simply played by the rules that the court, the Supreme Court has set down for decades, that they make disclosures about this type of evidence. This is a horrific crime. It is undoubtedly a horrific crime. But the question remains, is the proof that was presented to this jury when viewed in the light, as this Court recognizes in Cooper, of all of the evidence that this Court knows, and I respectfully remind the Court that that includes the deficiencies which we enumerated at length in Thomas Buckwalter's examinations of Norman Thomas, his failures to prepare, which this Court found so persuasive as to justify vacating the sentence, that if in light of all of that, there would still be the kind of significance in Norman Thomas's testimony that this jury had to have used when it rendered that verdict. And I respectfully submit the answer has to be no. Our standard, I guess, is whether we think that we would have lost confidence in the verdict, I guess is kind of the standard. Yes, Your Honor, that is correct. The standard has long been established. The Supreme Court has consistently applied it. It did again this term in Banks. But it hasn't wavered on this point. In reading the transcript of the interrogation of Silva by the policeman, he certainly at several points comes very close to saying I'm guilty, but he never crosses that line. But he certainly had a great deal of knowledge. He was there. And he would say, I don't know or I don't want to answer that. Sometimes he would answer, how would the jury view that testimony, put together with the forensic evidence? And possible, although Thomas would certainly be seriously discredited, his testimony would still be there, I assume. I suspect that it would still be there. That's correct, Your Honor. I think the way the jury, if Mr. Silva were represented properly at a trial, the way the jury would face the task of evaluating that post-arrest statement is knowing that he had ingested a huge amount of methamphetamines for a substantial period of time prior to his arrest, knowing that he had been on trial and convicted in Federal court for the manufacture of methamphetamine, so that completely independent of the crimes at issue in this matter, he already had, if you will, a guilty state of mind at the time of his arrest. We know from all the medical evidence that has been presented to this Court in our previous time here that the doctors who evaluated him found that at the time of these events, that is, the time he was making that statement to the undersheriff, he was not of such a state of mind that he could make knowing statements. So could the jury, in evaluating these statements, consider them to be inculpatory statements? Unquestionably. Would they? I don't think that's so easy to answer. And I think it should give this Court serious pause, and indeed, I respectfully suggest to the Court, in light of everything that we know, all of the rest about Norman Thomas that was not used at the trial, assuming a proper trial is had and Mr. Silva's state of mind is distorted, that when a jury hears all of it, it will not find that those statements were incriminating. What it will find is that they were the product of Mr. Silva's distorted state of mind at the time he made those statements. Roberts. Do you want to save the remainder of your time for a bunch of questions? I'm happy to do so. Thank you, Your Honor. Good afternoon, Your Honors. May peace please the Court. Deputy Attorney General Teresa Toroblanca on behalf of the Respondent. It's our position that this agreement absolutely should have been turned over and that it was favorable. But it was not material, because it's not reasonably probable that a different result would have been sued if that information had been turned over. The jury was given a great deal of information about Norman Thomas's credibility. They had Let me stop you right there. I don't think the standard is that the result would have been different. It's whether we could continue to have confidence in the verdict. Absolutely. I think that the statements have been stated various different ways, including that as the law. And I think that in this case, there should be confidence in this verdict. There was so much information before this jury about Norman Thomas's credibility. They knew about the plea bargain that he had gotten. They knew it was a very, very favorable plea bargain. They knew that Shelton had threatened Thomas and told him to place all of the blame on to Petitioner. They knew about his previous arrest record. But more importantly, they knew the information that caused the prosecutor to have some concern about Norman Thomas's state of mind. They knew about his motorcycle accident. They knew about his brain damage. They knew about his claim to trouble remembering things. They knew about his speech problems. Not only did he mention them, I'm assuming that that was before them. They were able to observe his mannerisms, his tone of voice, his ability to focus on the questions being asked. And they knew that he was at least crazy enough to have committed these crimes. He cut Kevin Thorpe up into several tiny pieces and buried him. And he also claimed that the rape was consensual in light of the fact that she was being held. I mean, obviously, these are the things that caused the prosecutor some concern. So the fact that the jury may not have known that the prosecutor was actually concerned wouldn't have changed the outcome here because they knew the things that were causing him concern. Except that they didn't know the State had made an agreement or sufficiently concerned that they made a side deal so that no psychological examination would occur until after trial. That fact, that they were willing to go to that length to suppress information from the jury, is fairly powerful. How do you respond to the addition of that information? Well, again, they did have the information of what caused the prosecutor concern. It's not the mental state, though, but the fact of the secret deal, at least in my experience, when something like that occurs, when the jury or the judge believes that one side has not been truthful or one side has been trying to keep information out, they tend to discredit the entire case. It's not just the segment, like we try to on appeal, saying, okay, if this happened, this might be prejudice, might be not, might have come in anyway. In the crucible of the courtroom, it has a profound effect. How do you respond to that argument? Well, I think that the jury would have obviously given some pause to that fact. But, and I don't know exactly why the prosecutor did what he did. It's possible that he just didn't want to muddy up all the issues. Counsel. I mean, it's, he obviously had some concern. But if you read his testimony, he's very, very, he seems very credible. And we know that he was evaluated later and came across as being sane, not having delusions. His memory was intact. And his, even his own attorney felt that his testimony was consistent. If you read the transcript, you can tell that those answers were consistent and all that information was before the jury. Absolutely, this should have been turned over. Absolutely, no doubt. And, you know, why the prosecutor did it, you know, I can't explain. He was overreaching. He was overreaching. And he had, and this was calculated on his part. Didn't Shelton plea? He had three people who are. He didn't plea. Okay. But he was, he wasn't sentenced to death for this. He served his time already. In fact. I believe he's still in prison. Okay. But he had a much shorter prison term, obviously, not death. Not death, but I think he got life. But the point I'm trying to make is that there were three of them there. And on the facts of this, we know all three of them were there. And all three of them participated. But all of a sudden, Silva is the one that the other two point to as the killer. And, okay, so the government, it has that evidence. It has the evidence that both of these two people are going to testify, I don't know if Shelton did, against Silva. And it has the fact of his presence and everything. Why did it have to overreach? I mean, you put, years later, you put our court in the position of having to look back and determine the effect of this on Thomas's testimony. And whether the jury would have disbelieved it and not convicted Silva. And, you know, that puts us all in a hard position. It's a hard standard to apply in this case and to read all these transcripts and even understand how they would impact the jury at that time. I mean, you know, I for one do not want to reverse this conviction. But I may feel I have to because of the government's conduct in this case. It was absolutely wrong. There's no doubt about that. I think that everyone agrees that this should have been turned over. But I just don't see this as being material. The evidence was exactly how Norman Thomas said it would be. He told the police exactly where Thorpe's body would be found. And that's where it was found. He described the use of the spotlight with the lens. They found the lens in Shelton's cabin. The autopsy showed that he was killed the way Norman Thomas said he was killed. The evidence corroborated Norman Thomas's testimony. Well, it could have been Thomas and Joe rather than Silva. Isn't that right? That's true. It could have been. But I think the jury saw that there was a motivation for Thomas to lie. And they believed him to the extent that the evidence backed it up. I think that might be one explanation for why they didn't convict him on Laura Craig's murder. Her body was eaten by animals. And therefore, they couldn't tell the exact cause of death with her. Whereas with Kevin Thorpe's body, it was exactly the way Norman Thomas said it would be. And he didn't make himself out to be a golden boy here. I mean, he admitted that he was chopping up Kevin Thorpe. And that he had consensual sex with Laura Craig. But yet admitted having sex with her while she was being held captive during these several days. So, I mean, I think the jury had all this information before them. And decided that Norman Thomas was credible. And the prosecutor's opinion, based on everything that the jury had before it, I don't think would have changed their opinion about his credibility. They knew exactly what they were dealing with here. Well, his testimony was corroborated by the physical evidence, except for the one crucial part that, well, Silva's smiling. And that is what everybody seems to think is the most powerful moment in the trial that probably got Ernst Silva the death sentence. Do you agree with that? I think that that was very powerful. I mean, that was his testimony pointing to Petitioner as the actual shooter in this case. And I think that that's the part that Norman Thomas's credibility has to be believed by the trier of fact. But I think this trier of fact had enough information before it to make that decision such that this would not change their opinion. Do you think if it came out, for example, at trial, that Thomas's attorney said, well, he's either incompetent or insane, and they said, okay, we're not going to get him tested. The jury hears that, that they're not going to say, well, we know all this other stuff, but the existence of the State's concern really gives us pause. I think the only thing that the jury would have had before it had been disclosed was that as part of the plea agreement, the defense agreed not to have Norman Thomas psychologically evaluated. That's all they would have had. Do you think so? Do you think that a competent defense attorney wouldn't get in all that other stuff? I think if this had been disclosed mid-trial, you would have really had a different trial. I don't see how they could have disclosed what the defense attorney, what Norman Thomas's defense attorney thought. How the deal came about, the negotiations for the deal, I think that, well, of course, it's all subject to admissibility at trial, but conceivably, there would be a trial judge somewhere that would let it in. And that would be, then the outcome, I think, might be different. I think it's interesting here that the, if this agreement had come out, and they forced, let's say they were able to force him to be psychologically evaluated, they would have seen that he was completely sane and that his memory was intact because that's what the report showed. So basically, all we're dealing with was this prosecutor's fear that maybe he wouldn't be. That, I mean, that's the thing that the jury didn't know. That's the sole thing that the jury didn't know. What that shows is that the prosecutor who's putting on this evidence has a concern that it's false. And that's pretty powerful. I agree that it definitely would have, I mean, it would have told the jury, be careful with this testimony. But the jury had before it all this information about his brain damage and his motorcycle accident and the fact that he participated in these horrible crimes before it. So I think that that was enough to assess his credibility in light of everything else that he was given, and all the other sweet deal that he got in exchange for his testimony. Unless the Court has any further questions. No, I think we've covered it. And your briefs are very good, so you don't need to retread those grounds. We understand your position. Thank you for your argument. May I just ask? I just want to ask. Would the State be able to retry Silva? You know, that's going to be up to the DA's office, whether witnesses are available and what they make their assessment to be. I don't know. That's elective. Right. I mean, I recall in Carragher, there was a Brady case. The State of Arizona made its decision one way or the other, and they decided in that case not to retry him. But my judgment is that that's up to the State. I think the question is, is the State legally precluded from retrying him? I think the answer to that is no. No. That's what I was asking. I'm sorry. Yeah. If I may start, Your Honor. Judge Wardlaw, I did not understand your question correctly earlier, because if it was going to that point, I agree. There is no legal barrier to Mr. Silva being retried in a guilt trial again, if this Court would have vacated his conviction. Well, we don't know about the availability of the witnesses. Those factual questions, I'm not able to answer. Nobody wants to know that. No, but this is not anywhere near a situation that is similar to Delaware Jeopardy. This is a – if it's reversed, then the defense would have to take their own course. Clearly subject to being tried for all the offenses again. If I may, there is a critical point about the psychiatric evaluation that counsel mentions that needs attention now, and that is that psychiatric evaluation, which she describes as innocuous, if you will, was done for a very different reason. It was done by Mr. Thomas' counsel for his sentencing. And I'm sure this Court has seen countless evaluations and the way they vary, depending upon the purpose of the evaluation. And it doesn't mean that the evaluating expert would apply different standards. It's just there are different filters through which facts are presented. It was presented for Mr. Thomas' sentencing. It was done by his counsel. So, of course, it's a favorable report. It would have been dramatically different if Mr. Gay had gone forward as he originally intended, seeking to establish that, in fact, Mr. Thomas was not either competent or else he was, in fact, insane, which was Mr. Gay's opinion at that point. And it doesn't take much speculation for any seasoned practitioner to know that that's a very different type of evaluation. I have to differ also with what counsel characterizes as consistency, if you will, between the evidence that was adduced and how the jury and that if this additional term were presented to the jury, there would be no different version. Counsel is quite understandably focusing on the actual trial that happened. But that trial is critically deficient. While counsel goes through the various things saying that, for example, Mr. Thomas' statements to law enforcement were consistent with the physical evidence and that they found Kevin Thorpe's body in the places where he indicated they would and so forth, it totally omits key, very inconsistent points that didn't come out only because Mr. Buckwalter didn't use them. It didn't bring out, for example, that initially Norman Thomas said he wasn't even there when Ms. Craig and Mr. Thorpe were apprehended. He wasn't there. That is dramatically different from what he testifies to later at trial saying that he was actually in the truck when they're there. He says early on in one of his initial statements that, no, he did not think Petitioner overheard what Shelton was telling him about how Thorpe was killed. It's not that he's not sure. He makes the affirmative statement. He did not believe Petitioner heard that. That is 180 degrees different and critical information from what actually was presented at trial. So counsel can stand here now and say there's no difference. If we solely focus on that which occurred in the actual trial of this matter. But this Court is bound by the Alambank decision in Cooper to review all the evidence that it has before it. And that evidence, as Your Honors know from our previous go-around, included the claims and the factual record which is in the excerpts now before the Court with those dramatically inconsistent statements that Norman Thomas made during those initial weeks when these events were first coming to light. And that's the point in time when the DA realized he had a huge problem with Norman Thomas and his potential for being found incompetent or even insane. Those inconsistencies got whitewashed and they disappeared. And I can't put that. Well, in large part, though, that goes to the previous claim you made about ineffective assistance of counsel at cross-examination. And I accept with all respect this Court's ruling that we did not establish a Strickland level error. And I'm not in any way challenging that ruling. What I'm saying is that that ruling is irrelevant to this Court's statement in Cooper that it nevertheless must evaluate all of the evidence that a Federal habeas court reviewing a Brady claim must review all of the evidence in the case before it, not just the evidence that goes to the Brady violation, but all of the evidence. And Your Honors have before you an unassailable, uncontradicted record. This witness gave hugely inconsistent statements on all of these operative points. It's tragic that those statements weren't used to challenge Mr. Thomas by Mr. Silva's trial counsel. It should have happened. That was a different failing. But now I'm talking strictly in the Brady context. Your Honors are duty-bound to go back and look at those things also in this context. And I can't predict how the Court may come out on the question, but I suggest those are very serious reasons the Court can't have any confidence in this verdict when it considers all of that evidence. Norman Thomas testified the way he did only because he wasn't challenged. But if this additional proviso in the plea agreement had come out, and if Petitioner had had effective trial counsel, this would have been a dramatically different trial. And, Judge Thomas, I agree. I can stand here, if you like, and go through all of the examinations and how, if I were the counsel, from the minute we started, everything would have shifted into a completely different configuration, knowing that. Not only do we bring out immediately from Norman Thomas himself that he has an additional proviso, that he is not to be psychiatrically evaluated, we also bring out that that was pursuant to his negotiations. We bring out that at those crime sites, that he was talking to law enforcement and to the district attorney, and the district attorney was watching him through all of this. And I don't make the conclusion right then during the evidentiary phase of the trial, but in closing arguments, I certainly have everything I need to argue to my jury how this man, this DA who sat there, who stood there, who walked with him, who talked with him, with all the police officers, knew he had a seriously mentally deficient man, and then he struck this deal that this man could not be psychiatrically evaluated. And I submit to the Court most respectfully, it would be a dramatically different trial. I can't say with any – I cannot say with total certainty the result would be different, but I don't think we can have any confidence in the result that's here, given the way the proceedings were conducted. But unless the Court has further questions, I realize my time is concluding, and I'll submit the matter. Thank you very much. And we appreciate the economy of your arguments, and we know it doesn't fully reflect the enormous amount of work that you've all put into it, which we've been through a number of times. So we spent a long time on this case. It's a very troublesome and difficult case, and we will take it under advisement. Thank you very much. Thank you.
judges: B. Fletcher, Thomas, Wardlaw